868 So.2d 804 (2004)
Brian GIBBS
v.
DELASANDRO PAINTING AND DECORATING.
No. 03-CA-1144.
Court of Appeal of Louisiana, Fifth Circuit.
February 10, 2004.
Sean P. Early, New Orleans, LA, for Plaintiff/Appellant.
Wade A. Langlois, III, Windhorst, Gaudry, Ranson, Higgins & Gremillion, L.L.C., Gretna, LA, for Defendant/Appellee.
Panel composed of Judges SOL GOTHARD, MARION F. EDWARDS and CLARENCE E. McMANUS.
SOL GOTHARD, Judge.
In this workers' compensation case claimant, Brian Gibbs, appeals a decision that found he suffered a work-related accident *805 which aggravated a preexisting condition, but found further that he forfeited his rights to the payment of benefits pursuant to La. R.S. 23:1208. Defendant, Delasandro Painting and Decorating (Delasandro), filed an answer to the appeal challenging the lower court's finding that claimant had suffered an aggravation of a preexisting injury. Defendant also argues the court erred in failing to award repayment of all benefits previously paid to the claimant, as well as reasonable litigation and investigation expenses, and in the failure to impose a fine.
Mr. Gibbs, who was employed as a painter with Delasandro, fell from a ladder while painting the side of a two-story home in the course and scope of his employment on March 6, 2001. He was taken by ambulance to Charity Hospital. He sustained injuries to his face, head, knee, leg, arm, back and neck in the fall. Delasandro paid workers' compensation benefits until May, 2002. Because benefits were terminated, Mr. Gibbs filed a disputed claim for compensation shortly thereafter. Discovery was conducted and in due course the matter went to a trial on the merits, after which the judgment complained of was rendered.
At the trial, the fact that claimant fell from the ladder while painting in the course and scope of his employment was the subject of a stipulation by both parties. The parties also stipulated to the introduction of various documents and depositions regarding claimant's medical treatment.
At the hearing, the court heard testimony from Marco Delasandro, who is the owner of Delasandro Painting and Decorating. Mr. Delasandro testified that he knew claimant for about fifteen years and that Mr. Gibbs worked for the company as a painter off and on. Mr. Delasandro classified Mr. Gibbs as a hard, but somewhat unreliable, worker. Mrs. Delasandro, who does the payroll for Delasandro testified that claimant earned $10.00 per hour and sometimes worked a forty hour week. Mrs. Delasandro also testified that she went to the hospital after she was informed of Mr. Gibbs's accident. When she arrived, Mr. Gibbs was standing outside smoking. His face and hands were bloody. His face was bruised and swollen.
Mr. Gibbs testified that he is thirty-six-years old and has been doing construction work since he was sixteen. He is currently unemployed and living in a motel room. Mr. Gibbs stated that he worked for Delasandro several times over the past ten years. As Mr. Gibbs explained it, he would work for a while, then quit, and then return. He testified that he has had minor injuries while working in the past, but nothing for which he filed a workers' compensation claim. He acknowledged that he did file a lawsuit as a result of an automobile accident, which was subsequently settled. Mr. Gibbs admitted having problems with his neck prior to this accident in question herein. He stated that he had bone spurs on his neck which caused arthritis. This condition was discovered after diagnostic X-rays were conducted at East Jefferson Hospital. However, he denied ever having an MRI. Mr. Gibbs further testified that he made several visits to the emergency room of East Jefferson Hospital, some of which were for neck problems.
Mr. Gibbs stated that when he fell from the ladder, his head hit the metal edge of the ladder, causing a large gash on his forehead. He estimated he fell about twenty-two feet and landed on his head. He was taken to Charity Hospital by ambulance where he was treated for a sprained knee and wrist, and a jagged gash between his eyes. As a result of the fall he had to undergo plastic surgery on his face.
*806 In regard to the neck injury, Mr. Gibbs testified that after the fall more X-rays of the cervical area were conducted. The tests confirmed that Mr. Gibbs had bone spurs and he was told by doctors that his pain was from an old injury. He was released to return to work. Mr. Gibbs attempted to return to work shortly after the fall, but the pain in his neck was too intense. He consulted Dr. Robert Steiner who ordered an MRI. As a result of the findings in the MRI, Dr. Steiner recommended surgery. Mr. Gibbs was referred to Dr. Gregory Dowd, who performed a cervical fusion at the C5-6 disc level on October 8, 2001. During this period Mr. Gibbs was receiving weekly workers' compensation and medical benefits. However, all benefits were stopped on February 1, 2002. Since that time, Mr. Gibbs attempted to work with his father, who owns a construction company, doing sheetrock finishing and painting. However, the pain was unbearable and Mr. Gibbs was unable to work more than a few days at a time without resting for several days. Because he was unable to complete the work given him in a timely manner, Mr. Gibbs can no longer work in construction work.
On cross-examination, Mr. Gibbs testified that he sprained his neck and hurt his back in an automobile accident in 1997. At that time he consulted Dr. Stewart Altman for that injury. The neck pain lasted longer than the back pain, and over the years he has developed some arthritis and bone spurs in his neck which have caused pain. Mr. Gibbs stated that he did not recall Dr. Altman referring him to another physician for treatment at the time of the 1997 injury. Mr. Gibbs stated that he has been taking Vicodine for his neck pain since the accident in 1997.
Mr. Gibbs also acknowledged that he injured his neck in two work-related accidents in 1998, and in motor vehicle accidents in April and September of 2000. He further stated that he began to see Dr. Isadore Brickman for the neck and shoulder pain in May of 2000, and continued seeing him on a monthly basis until the fall in question herein. Mr. Gibbs also admitted hurting his neck and right shoulder pulling up a tree stump in December of 2000. At that time he had a CAT scan of his neck and was told he had bone spurs. Mr. Gibbs denied being told he had a herniated disc in his neck and that he should see a neurologist or an orthopedist. However, he did recall Dr. Brickman telling him to get an MRI. In conclusion, Mr. Gibbs maintained that the pain he was experiencing before the fall was made considerably worse by the fall, and that he is now unable to work.
Diane Gibbs, Mr. Gibbs' mother, testified for the claimant. She stated that her son had some minor pain before the fall, but was considerably worse afterward. He is now unable to work in construction as he was doing for years before the fall.
Dr. John Olsen, a neurologist who also treated Mr. Gibbs, testified that Mr. Gibbs came in after the surgery complaining of headaches, neck pain radiating into the right arm, and back pain radiating into both hips. Dr. Olsen testified that Mr. Gibbs had multiple disc herniations including the C5-6, C4-5 and C6-7, as well as some cord compression. Dr. Olsen explained that Mr. Gibbs had herniations above and below the fusion, and it is a surgical decision whether to fuse all three levels.
Dr. Olsen's findings after testing were that Mr. Gibbs had evidence of root involvement on the right side at C6-7, with some involvement at C5. He also had feet and ankle problems secondary to cord damage sustained in the fall.
Dr. Olsen referred Mr. Gibbs to Scott Vaughn, a physical therapist, for a functional *807 evaluation. The results of the evaluation showed a right sided strength loss of 13%, with a five percent impairment for the shoulder flexation with involvement of the axillary nerve. He also showed a 13% strength loss in elbow flexion with involvement of the brachial plexus, which gives rise to a total upper extremity impairment of 17%. The evaluation also showed a spine impairment of 23% and a right upper extremity impairment of 10%, giving rise to a 31% impairment of the whole person.
Dr. Olsen reviewed the findings of earlier diagnostic tests conducted before the surgery and opined that Mr. Gibbs' condition has improved dramatically, but his cervical spine remains significantly compromised. In conclusion, Dr. Olsen stated that he found Mr. Gibbs to be disabled for his former occupation, which required him to do a significant amount of heavy work. Dr. Olsen attributed the injury to the fall and stated that Mr. Gibbs may need further surgery in the future.
On cross-examination, Dr. Olsen testified that Mr. Gibbs first consulted him over a year after the fall and related that the pain began as a result of the fall. When Dr. Olsen took Mr. Gibbs' medical history, he did not indicate any prior neck problems. Dr. Olsen also testified that he had the MRI reports taken at the time of the surgery, but he did not have the records from Charity Hospital or Dr. Dowd.
Dr. Isadore Brickman, a general surgeon who treated Mr. Gibbs before the fall, testified that Mr. Gibbs first came in for treatment on May 11, 2000. He complained of neck pain and shoulder pain from a motor vehicle accident about one year earlier, although he indicated to the doctor that the pain was ongoing for about five years. Dr. Brickman ordered X-rays, gave him some pain medications, and gave him a letter of referral to an orthopedic physician. Dr. Brickman understood that the physician treating Mr. Gibbs at the time of the accident wanted an MRI, but Mr. Gibbs was unable to afford one. Dr. Brickman saw Mr. Gibbs monthly and prescribed Vicodine, Prozac and Arthrotec for pain, depression and inflammation. Mr. Gibbs did not see a specialist because he had no insurance and could not afford to pay the cost himself. Although Dr. Brickman wrote several referrals for Mr. Gibbs to go to LSU Medical Center to have the necessary tests, he did not go. Dr. Brickman suspected that Mr. Gibbs had a herniated disc of the cervical spine with neuropathy, but without the diagnostic tests, he could not be certain. By December 18, 2000, the pain in Mr. Gibbs' neck and upper extremities became acute and Dr. Brickman advised his patient to go to Charity Hospital immediately. At that time Mr. Gibbs was experiencing continuous pain with decreased sensation, paraestheia, decreased motor function, and Dr. Brickman felt Mr. Gibbs needed immediate orthopedic consultation and probable admission. When Mr. Gibbs returned to Dr. Brickman's office on January 9, 2001, he had scheduled an MRI for February 5th, and was still in great pain. Dr. Brickman encouraged Mr. Gibbs to return to Charity Hospital Emergency Room and have the procedure sooner. Mr. Gibbs returned to Dr. Brickman's office on January 25, 2001 and February 5th and 26th. Mr. Gibbs's pain was unrelenting in his neck and right arm. Dr. Brickman explained that he was unable to order the MRI, consequently he was relying on Charity Hospital to order the test. He did not see an MRI report while he was treating Mr. Gibbs.
When Mr. Gibbs returned to see Dr. Brickman on March 20, 2001, he told the doctor about the fall on March 6th which is the subject of this litigation. This fall *808 worsened the neck pain and intensified the radiculopathy.
The record also contains documentary evidence including a report from Dr. Gordon Nutik dated April 4, 2001, shortly after the fall. In the report, Dr. Nutik stated that "(p)ast history is significant for a neck injury following a motor vehicle accident in 1997. He states that he did have a CT scan of his neck in 2000 but no previous MRI. He states he was having no ongoing symptoms referable to his neck after recovery."
The deposition of Dr. Gregory Dowd is in the record. In that deposition Dr. Dowd stated that he first saw Mr. Gibbs on June 12, 2001 for the purpose of a neurosurgical consultation. At that time Mr. Gibbs reported neck and right arm pain caused by his fall on March 6, 2001. Mr. Gibbs gave Dr. Dowd a medical history at that time which included mention of prior back and neck pain. Dr. Dowd's understanding of Mr. Gibbs' pain was that he had more constant pain in his neck after the March 6th fall and that the pain was now radiating into his arm. Dr. Dowd conducted an MRI which showed that Mr. Gibbs had an uncovertebral hypertrophy at the C5-6 level, with posterior bony projection from the disc space. These findings were consistent with Mr. Gibbs' complaint of pain. Dr. Dowd explained that the uncovertebral hypertrophy found in the MRI could be from the bone spurs or from a fresh herniation. Although Dr. Dowd felt that it was caused by the bone spur, he admitted there is no way of telling for certain it was not a fresh herniation. Dr. Dowd continued in his testimony and stated that even if the cervical area affected was developing gradually, the fall he experienced likely aggravated and triggered his radiculopathy.
At the deposition, Dr. Dowd was shown medical records from East Jefferson Hospital in December of 2000 which included a CT scan that showed a similar diagnosis to the MRI taken by Dr. Dowd. Dr. Dowd commented that such findings would explain the neck, shoulder, and arm pain experienced by Mr. Gibbs. Dr. Dowd again stated that he knew of the prior injury to the neck as a result of the 1997 vehicle accident, but was unaware that the pain had radiated into the arm before the March 6th fall.
After conservative treatment failed to relieve the pain, Dr. Dowd performed a C5-6 anterior discectomy on Mr. Gibbs on October 8, 2001. The surgery relieved the pain in the shoulder and arm and lessened the numbness. Dr. Dowd testified further that Mr. Gibbs is progressing normally, but does have some residual pain in his neck. Mr. Gibbs was released for regular activity on April 30, 2002. In June of 2002, Mr. Gibbs returned to Dr. Dowd with complaints of pain which indicated a different distribution of nerve irritation. To determine if this pain was related to the neck injury or a new injury in the arm, Dr. Dowd ordered an EMG nerve conduction study. However, that test was not conducted because it was not approved by the workers' compensation provider. In Dr. Dowd's opinion from the examination he conducted, Mr. Gibbs' new problem was a new injury to the ulnar nerve and unrelated to the fall in March of 2001.
When questioned about Mr. Gibbs' ability to return to work in construction, Dr. Dowd testified that he should be able to return to activity without limitations. However, the doctor did acknowledge that a fusion at one level of the cervical spine puts greater force on the discs surrounding the fusion which can lead to new problems.
Dr. Dowd was asked directly whether the March 2001 fall necessitated the surgery. Dr. Dowd opined that the fall *809 caused the need for the surgery. He stated, "I would say yes but for his fall of March 2001 he may not have needed that surgery."
As previously stated, the trial court rendered a judgment after trial in which it found that Mr. Gibbs sustained a compensable injury in the fall of March 6, 2001. The court further found that the fall aggravated a preexisting condition. However, the court also found that Mr. Gibbs forfeited his rights to the payment of workers' compensation benefits from defendants pursuant to La. R.S. 23:1208.
Both parties appealed the decision. Claimant argues the trial court erred in finding he forfeited his rights to compensation. Defendant maintains the trial court was correct in that finding, but argues the trial court erred in not ordering claimant to repay all benefits paid. In the alternative, defendant argues the trial court erred in finding that claimant aggravated a prior condition in the fall.
La. R.S. 23:1208A provides:
It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
La. R.S. 23:1208 authorizes forfeiture of benefits upon proof that: (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. The party who requests that the benefits be forfeited must show that the employee's statements were not only false, but they must also show that the statements or misrepresentations were willful and deliberately done with the intent to obtain benefits. Resweber v. Haroil Const. Co., 94-2708 (La.9/05/95), 660 So.2d 7. This Court has fully summarized the appropriate interpretation and application of La. R.S. 23:1208 in Marler v. New Orleans Council, Boy Scouts, 01-1167 (La.App. 5 Cir. 3/13/02), 815 So.2d 131.
The requirements for forfeiture under Section 1208 are broadly worded and are applicable to false statements or representations, including those concerning prior injuries. In reviewing the findings of fact, we also are mindful that statutory forfeiture is a harsh remedy and, therefore, must be strictly construed. The relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits. False statements that are inadvertent or inconsequential will not result in forfeiture. After establishing that a claimant has made a false statement or misrepresentation which could result in forfeiture of benefits, the hearing officer must make a factual determination as to whether, based on the record, the statement was willfully made specifically to obtain benefits, and thus defraud the workers' compensation system.
Whether a claimant forfeited his right to workers' compensation benefits is a question of fact that will not be disturbed on appeal unless the finding is clearly wrong or manifestly erroneous. Reasonable evaluations of credibility and reasonable inferences of fact by the trial court will not be disturbed, even though our appellate review may lead us to another reasonable evaluation.
(citations omitted)
Id. 815 So.2d at 135.
In the instant case, there is no indication in the record of findings of fact on which the workers' compensation court based its finding that compensation for the exacerbation of the preexisting condition *810 was forfeited. The court does not specify the misrepresentations made by claimant that it considered willful and consequential enough to warrant the severe penalty of forfeiture.
In brief to this court, defendant argues that claimant made false statements regarding his prior neck injuries by "down playing his neck injury." Defendant cites several misrepresentations regarding prior neck injuries made to doctors about the extent of the neck injury and the number of accidents which occurred before the fall at issue herein on March 6, 2001. Defendant does not maintain that Mr. Gibbs was untruthful about having a prior neck injury; rather, the argument is restricted to the statements made by Mr. Gibbs regarding the extent of the prior injury and the deterioration of the cervical disc before the fall.
We are reminded that the statutory forfeiture of workers' compensations benefits is penal in nature and must be strictly construed. Town of Grand Isle v. Eschette, 02-96 (La.App. 5 Cir. 5/29/02), 820 So.2d 1122, writ den. 02-1810 (La.10/4/02), 826 So.2d 1131. We have reviewed the evidence presented to the lower court and find that claimant's inconsistencies and misrepresentations in this case do not rise to the level of willfulness required to forfeit compensation pursuant to La. R.S. 23:1208. We hold that the lower court was clearly wrong in that determination.
Mr. Gibbs has been consistent from the outset in his statements that he had a prior neck injury which began with a motor vehicle accident in 1997. He has also consistently maintained that the degree of pain he experienced after the fall was more intense than that suffered before the fall. He did not have an MRI before the fall because he was unable to afford one and he had no insurance. Thus, the exact extent of the cervical problem before the fall cannot be determined. Neither party disputes that claimant fell about 20 feet from a ladder, landing on his head and face, while working in the course and scope of his employment.
Although claimant clearly had cervical and other complaints of pain, he was able to work during his treatment. Both Dr. Brickman and Dr. Dowd testified that the fall worsened Mr. Gibbs' cervical condition. Dr. Dowd specifically testified that but for the fall Mr. Gibbs would not have needed the surgery. Dr. Dowd stated that Mr. Gibbs reported neck problems since a motor vehicle accident in 1997 which have continued to varying degrees, but became worse after the fall. While defendant did point out that Mr. Gibbs did not tell Dr. Dowd that the pain radiated into his left arm, we do not find that inconsistency to be of a nature to penalize claimant in such a harsh way. See; Ivy v. V's Holding Co., 02-1927 (La.App. 1 Cir. 7/2/03), 859 So.2d 22.
We understand that the Legislature enacted the anti-fraud provisions of the Louisiana Workers' Compensation Act to address the growing problem of fraudulent claims made for workers' compensation benefits. However, we do not find this to be a fraudulent claim. Claimant herein has worked in construction work for many years in spite of cervical problems. He suffered a severe fall in which the trial court found he aggravated that preexisting condition. We believe this is the type of worker who is entitled to workers' compensation benefits and we find that the inconsistencies in this case do not rise to the level of fraud.
We have considered defendant's alternative argument that the lower court erred in finding the Mr. Gibbs had a preexisting condition that was aggravated by the fall and find it unconvincing. The *811 testimony of the treating physicians is more than ample evidence to support the trial court's finding of fact on that issue.
For the reasons given herein, we reverse the judgment of the trial court in so far as it decrees that claimant forfeited his rights to the payment of workers' compensation benefits from defendants pursuant to La. R.S. 23:1208. In all other aspects, we affirm the judgment. Costs of this appeal are assessed to defendant.
REVERSED IN PART; AFFIRMED IN PART